Filed 8/28/23  Garland Connect v. Wells Fargo Bank CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| GARLAND CONNECT, LLC, | B316135 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV16050) |
| v. | |
| WELLS FARGO BANK et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of dismissal of the Superior Court of Los Angeles County.  Jon R. Takasugi, Judge.  Affirmed.

Greene Broillet & Wheeler, Scott H. Carr and Christian T.F. Nickerson; Esner, Chang Boyer & Murphy, Stuart B. Esner and Kathleen J. Becket for Plaintiff and Appellant.

Musick, Peeler & Garett, Dan Woods and Cheryl A. Orr for Defendants and Respondents.

—————————————

## INTRODUCTION

Plaintiff Garland Connect, LLC (Garland Connect) appeals from a judgment of dismissal in favor of defendants Wells Fargo Bank, National Association (Wells Fargo Bank), Barbara Reeve-Bailey, and Mark A. Ingram (collectively, Wells Fargo). The action arises out of an operating agreement that Garland Connect entered into with third-party Charter Garland MMR, LLC (Charter Sub) as of March 7, 2011. Charter Sub held a sublease to a portion of the Garland Center office building used for telecommunications services. Pursuant to the operating agreement, Charter Sub granted Garland Connect the right to manage and operate a "meet-me room" (MMR) at the Garland Center and to provide other telecommunications-related services. An MMR is a physical space in a building that provides for the interconnection of tenants, telecommunication carriers, and other network service providers. In return, Garland Connect agreed to pay an operator fee and to share the revenue from the operations.

The initial term of the operating agreement expired on February 28, 2019. The agreement granted Garland Connect options to extend the term for two additional five-year periods, subject to and conditioned on the extension of upstream subleases and leases. The agreement expressly provided that Charter Sub and the upstream lessors and lessees had no obligation to extend the subleases and leases.

The building was sold to HRRP Garland, LLC (HRRP), a subsidiary of defendant Rising Realty Partners, LP. Charter Sub assigned its rights and obligations under the operating agreement to HRRP. The upstream leases and subleases were extinguished as part of the sale. HRRP declined to extend the

2

term of operating agreement beyond the February 28, 2019 termination date. In a related action, Garland Connect sued HRRP for breach of contract based on HRRP's alleged failure to honor the options and sought a declaration that the options were still valid. The trial court entered judgment in favor of HRRP, concluding HRRP was not required to extend the term. In an unpublished decision, we affirmed the judgment. (*Garland Connect, LLC v. HRRP Garland, LLC* (Apr. 27, 2021, B296192 [nonpub. opn.].)

In this action, Garland Connect sued Wells Fargo and others for intentional and negligent interference with contractual relations and intentional and negligent interference with prospective economic advantage. Garland Connect alleged Wells Fargo intentionally structured the acquisition transaction in a way that resulted in the termination of Garland Connect's extension options and intentionally induced HRRP to breach the operations agreement. The trial court sustained Wells Fargo's demurrer to the first amended complaint without leave to amend and entered a judgment of dismissal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Leases and Subleases for the Garland Center Building and Land*

At the time Garland Connect entered into the operating agreement, Wells Fargo Bank owned the land on which the Garland Center was built. Wells Fargo Bank had leased the land to Trumbull Associates Limited Partnership (Trumbull), which owned the Garland Center building. Trumbull leased the land and the building to RML Leasing Corporation (RML) pursuant to

3

a master lease agreement. RML subleased the land and building to First Interstate Bank of California (First Interstate). Wells Fargo Bank succeeded by merger to all rights, title, and interest of First Interstate in the RML lease. Wells Fargo Bank assigned its rights as tenant under the lease to its affiliate, Charter Holdings, Inc. (Charter Parent).

Charter Parent leased the portions of the building to be used for the MMR and other telecommunications services to Charter Sub for an initial term expiring February 28, 2019.

B.   *Operating Agreement*

Charter Sub "desire[d] for an independent contractor to operate and manage" the MMR and related facilities, and Garland Connect "desire[d] to be the exclusive manager and operator of" those facilities. Charter Sub granted Garland Connect the sole and exclusive right to manage and operate the MMR during the term of the agreement, and Garland Connect agreed to so operate and manage the facilities. Garland Connect was granted a license to occupy the property to provide these services. Under the agreement, Garland Connect would charge tenants and other customers for the services and would pay Charter Sub operator fees plus a specified share of the revenues.

The agreement set forth the respective rights and duties of the parties in detail. Among other things, the agreement spelled out which party was responsible for operating costs and for the construction of improvements and upgrades. The agreement also contained detailed provisions regarding the rates Garland Connect could charge Garland Center tenants and other customers for MMR services.

4

The agreement provided the initial term would expire on February 28, 2019, which was also the date the upstream leases and subleases were set to expire.  The operating agreement provided:  "[Garland Connect] acknowledge[d] that the term of this [operating agreement] and all rights of [Garland Connect] hereunder shall automatically terminate upon termination of a Superior Lease, and [Garland Connect] acknowledge[d] that it must vacate and surrender the MMR in the condition required under the terms of this [operating agreement] by no later than the Expiration Date" of February 28, 2019 (subject to the extension options).  The agreement further stated that Charter Parent had covenanted to Charter Sub that Charter Parent would not take any actions to terminate the RML lease before February 28, 2019. Charter Sub agreed it would take any actions required to ensure the RML lease would remain in effect through the initial termination date of February 28, 2019.

Charter Sub granted Garland Connect options to extend the term for two five-year periods.  Each of the extension options was "expressly subject to, and conditioned upon (a) RML, in its sole and absolute discretion, exercising its option to extend the term of the Master Lease for the Land and the Building through the applicable Option Term, and (b) Charter Parent, in its sole and absolute discretion, exercising its option to extend the RML Lease such that the RML Lease shall extend through the applicable Option Term."  The agreement further provided:  "No Obligation to Extend.  It is expressly understood and agreed that Charter Sub shall have no obligation to take any action or make any effort with respect to any extension or renewal of the RML Lease or to otherwise attempt to secure any right to lease or

5

occupy all or any portion of the Building after February 28, 2019."

The agreement further provided: "For the purposes of this Operating Agreement: (a) 'Charter Sub' means [Charter Sub] or any successor in interest, but only for the time that any such person is the sublessee to Charter Parent of the Premises in accordance with and subject to the provisions of Section 23.4." Section 23.4 provides in part: "Transfers of Charter Sub's Interest. The covenants and agreements of Charter Sub under this Operating Agreement following any transfer shall not be binding on any person at any time holding the interest of Charter Sub (including the original named Charter Sub) subsequent to the transfer of that person's interest in the Building. In the event of such a transfer, the covenants and agreements of Charter Sub thereafter shall be binding upon the transferee of Charter Sub's interest."

C.      *Sale of the Building to HRRP*

On June 3, 2016, Charter Parent sent Garland Connect a letter notifying Garland Connect that Charter Parent, Wells Fargo Bank, RML Leasing, and Trumbull had sold the property to HRRP. Charter Sub's rights and obligations under the operating agreement were assigned to HRRP as part of the deal. The letter stated: "As of the date hereof, Sellers' interest in your license has been assigned to Purchaser, and Purchaser has assumed the obligations as landlord under your license. [¶] . . . [¶] . . . Purchaser advises Licensee that Purchaser has acquired all fee and leasehold interests in the Property, including the interests in the RML Lease and Master Lease . . . and that, upon the Closing, all such leasehold interests merged into the fee

6

interest in the Property and all such agreements granting the leasehold interests, including the RML Lease and Master Lease, terminated in their entirety. . . . All rights contingent upon the existence and renewal of the Master Lease and RML Lease, including any extension rights, are hereby extinguished in connection with and as a result of the termination of such agreements as a result of the acquisition of the property." Garland Connect responded with a letter disputing HRRP's interpretation of the agreement.

D.     *HRRP's Initiation of Arbitration Regarding Garland Connect's Alleged Breaches of Operating Agreement*

Soon after HRRP acquired the property, a dispute arose between HRRP and Garland Connect. HRRP claimed Garland Connect had materially breached provisions of the operating agreement requiring Garland Connect to charge market rates and to provide market research on rates to HRRP. On January 13, 2017, HRRP declared Garland Connect to be in default of the operating agreement. Both sides demanded arbitration. HRRP sought a declaration that it was entitled to terminate the agreement in light of Garland Connect's alleged material breaches.

The arbitrator found in favor of Garland Connect, concluding Garland Connect had not breached the operating agreement. Although the operating agreement gave the arbitrator the discretion to award attorney fees to the prevailing party, the arbitrator declined to do so. The arbitrator issued her award on July 16, 2018. The arbitration did not concern whether the extension options were still in effect.

E.      *Garland Connect's Attempt To Exercise Its Purported Options To Renew*

On September 7, 2017, Garland Connect sent a letter purporting to exercise the option to extend the term of the agreement for five years, from March 1, 2019 to February 29, 2024.  HRRP responded that the purported exercise of the option was invalid because the master lease and the RML lease were no longer in existence.

F.      *Garland Connect's Lawsuit Against HRRP Seeking a Declaration That the Options Were Still Valid*

On February 6, 2018, Garland Connect sued HRRP in Los Angeles Superior Court, Case Number BC692951.  "Garland Connect alleged that it had notified HRRP 'of its intention to exercise the first of its extension options,' but HRRP claimed the extension options had been extinguished.  Garland Connect sought a declaration that it 'ha[d] the right to extend the Operating Agreement for the two 5-year option periods,' and specific performance 'of [the] options to extend the term of the Operating Agreement.'" (*Garland Connect, LLC v. HRRP Garland, LLP, supra,* B296192.)[1]  Garland Connect also asserted claims for breach of contract and breach of the covenant of good faith and fair dealing based on HRRP's alleged "'efforts to deprive Garland Connect of the extension options.'" (*Ibid.*)

---

[1]      We cite our unpublished decision pursuant to California Rules of Court, rule 8.1115(b), which provides:  "An unpublished opinion may be cited or relied on:  [¶]  (1) [w]hen the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel."  Garland Connect does not contest the decision must be given collateral estoppel effect in this action.

The trial court sustained HRRP's demurrer to the first amended complaint without leave to amend and entered judgment of dismissal on March 18, 2019.[2] We affirmed, reasoning: "The Operating Agreement had a 92-month term, 'in all events ending on February 28, 2019 . . . subject to the Extension Options.' The extension option provision states that each extension option is 'expressly subject to[] and conditioned upon' RML and Charter Parent exercising their options to extend their respective leases. [¶] Garland Connect pleads no facts suggesting that the plain terms of the extension options are ambiguous or uncertain. The Operating Agreement unequivocally states that Garland Connect had no right to extend the agreement beyond February 28, 2019 unless RML and Charter Parent exercised their respective extension options. Garland Connect acknowledged the conditional nature of its extension options in its first amended complaint, which alleges that the agreement 'state[s] that Garland Connect's extension options [are] conditioned on the corresponding extension of the Master Lease and RML Lease through the extended term granted by Garland Connect's option.' In the absence of any factual allegations supporting Garland Connect's claim of ambiguity, the trial court did not err in concluding that the first amended complaint did not allege facts sufficient to state causes of action premised on an argument that Garland Connect's extension options were not conditional." (*Garland Connect, LLC v. HRRP Garland, LLP, supra,* B296192.) We further

---

[2] On our own motion, we take judicial notice of the date the judgment was entered.

9

concluded the court had not abused its discretion in denying leave to amend.

G.    *This Lawsuit*

On May 18, 2019, Garland Connect filed this lawsuit against three groups of defendants:  (1) Wells Fargo (i.e., Wells Fargo Bank and its former vice presidents Reeve-Bailey and Ingram); (2) Wells Fargo Bank's wholly owned subsidiary Eastdil Secured Broker Services, Inc. and its managing director Stephen Somer (collectively, Eastdil defendants); and (3) HRRP affiliate Rising Realty Partners, LP and its executive officers Christopher Rising, Nelson Rising, Tyson Strutzenberg, and Matthew Ahrens (collectively, Rising Realty defendants).  The only claims at issue in this appeal are those against Wells Fargo.[3]

Garland Connect filed the operative first amended complaint on June 26, 2019.  Garland Connect alleged it had two five-year options to extend the operating agreement beyond February 28, 2019.  Beginning in September 2015, during the course of negotiations for the sale of the building, Wells Fargo engaged in an "unlawful scheme to oust Garland Connect from its role as the MMR Operator immediately after [HRRP] purchased the Garland Center building and thereby deny Garland Connect its negotiated Extension Options under the Operating Agreement. . . .  In furtherance of [its] unlawful scheme to oust Garland Connect, [Wells Fargo] . . . specifically structured the agreements for acquisition of the Garland Center in such a

---

[3]    Garland Connect dismissed its appeal against the Eastdil defendants on August 11, 2022.  The claims against the Rising Realty defendants were dismissed with prejudice in the trial court on March 25, 2022.

10

manner as to prevent the fulfillment of conditions precedent for, and thereby attempt to preclude, Garland Connect's exercise of its Extension Options.  [Wells Fargo] . . . also interfered with Garland Connect's contractual relationships with its customers by contacting certain customers and making misrepresentations and misleading statements to them in order to induce them not to renew their contracts with Garland Connect."

Garland Connect further alleged that to induce prospective buyers into acquiring the Garland Center, Wells Fargo represented to prospective buyers (including HRRP) that it would be able to terminate the operating agreement by acquiring the fee interest of the Garland Center as well as the master and RML leases.  Wells Fargo conducted legal research into how the operating agreement could be terminated and shared the information with prospective buyers.

In reliance on Wells Fargo's legal research and representations, HRRP's parent, Rising Realty, planned to remove Garland Connect as the MMR operator by filing a "frivolous lawsuit" funded by Wells Fargo seeking to terminate the extension options.  Wells Fargo selected the buyer because it agreed to Wells Fargo's scheme to oust Garland Connect as operator of the MMR.  Wells Fargo Bank's vice presidents Reeve-Bailey and Ingram formulated the plan as part of a personal vendetta against one of Garland Connect's members.

On or about June 3, 2016, HRRP purchased and acquired the fee interest in the Garland Center property and also acquired the upstream lease interests of Charter Parent and Charter Sub under the Ground Lease Arrangements.  The Operating Agreement was assigned to HRRP as part of the purchase transaction, and HRRP succeeded to Charter Sub's rights and

11

obligations thereunder.  Consistent with Wells Fargo's plan, HRRP took the position that it had no obligation to honor the extension options.

Garland Connect was harmed by Wells Fargo's actions. Garland Connect relied on the extension options in entering into the operating agreement and investing over $2.5 million in improvements.  Because of Wells Fargo's interference with the extension options, Garland Connect has been unable to enter into firm contracts with its customers for periods beyond February 2019; instead, any customer contracts are contingent on Garland Connect's ability to exercise the options.

Garland Connect asserted claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage against Wells Fargo and other defendants.  In the claim for intentional interference with contractual relations, Garland Connect alleged that Wells Fargo caused the acquisition agreements to be structured to make it impossible for the conditions precedent to the extension options to be fulfilled; induced HRRP to breach the operating agreement by refusing to honor Garland Connect's extension options; and agreed to pay HRRP's attorneys' fees for litigation regarding the issue.

In the claims for intentional and negligent interference with prospective economic advantage, Garland Connect alleged that Wells Fargo interfered with Garland Connect's ability to enter into new contracts with its customers for the period beyond February 28, 2019 by interfering with Garland Connect's ability to exercise its extension options.  Garland Connect also alleged that Reeve-Bailey and Ingram falsely told Rising Realty (HRRP's

12

affiliate) that Garland Connect caused a prior tenant to file bankruptcy by charging the prior tenant above-market rates, but Garland Connect did not allege what harm allegedly flowed from those misrepresentations.  Garland Connect sought compensatory and punitive damages.

All defendants demurred.  Wells Fargo incorporated by reference the arguments made by the Rising Realty defendants. The Rising Realty defendants argued the claim for intentional interference with contractual relations failed because Garland Connect had no right to exercise the extension options. Specifically, "[w]hen Charter Parent and RML chose to sell their interests to HRRP rather than exercise their extension options, the conditions precedent to the exercise of GC's extension options failed."  The operating agreement expressly contemplated the upstream leases might not be renewed and the options extinguished.  The defendants did not induce a breach or disruption of the contract because there was no breach; rather the agreement was terminated by its own terms.  The Rising Realty defendants further argued that the claims for intentional and negligent interference with prospective economic advantage failed because Garland Connect did not allege the defendants engaged in any independently wrongful act.

In opposition, Garland Connect argued the conditions precedent were excused because HRRP caused their failure. HRRP therefore breached the agreement by failing to extend the term in accordance with Garland Connect's options.  The Wells Fargo defendants induced that breach.  Garland Connect argued that it had sufficiently alleged independently wrongful conduct because Garland Connect alleged Wells Fargo's vice presidents had made false statements regarding Garland Connect's pricing.

13

Garland Connect also argued the court should stay the action and defer ruling on the demurrer until after the appeal in *Garland Connect, LLC v. HRRP Garland, LLP, supra,* B296192, was resolved.

Garland Connect filed a separate motion to stay the action pending resolution of the appeal in *Garland Connect LLC v. HRRP Garland, LLP*, *supra,* B296192, arguing that a final ruling in that case would "determine all or some of the issues in this case." Specifically, Garland Connect argued: "The issue of whether Garland Connect had the right to extend the [o]perating [a]greement term beyond February 28, 2019 was the focus of [*Garland Connect, LLC v. HRRP Garland, LLP*], which is now pending on appeal. In order to avoid the possibility of conflicting rulings and because final appellate resolution of [that matter] would conclusively determine all or some of the issues in this case . . . a stay of this case . . . is appropriate, pending final appellate resolution [of *Garland Connect, LLC v. HRRP Garland, LLP*]." The trial court granted the motion and stayed the matter.

After we issued the remittitur in *Garland Connect LLC v. HRRP Garland, LLP*, *supra,* B296192, the trial court lifted the stay in this action. The parties filed supplemental briefs regarding the effect of our decision. The defendants filed a joint brief that reiterated their position that a defendant cannot interfere with contractual rights a plaintiff does not have. In its supplemental opposition, Garland Connect argued a defendant could still be liable for tortious interference of a contract even if the parties to the contract have a right to terminate it. Garland Connect further argued that if the court were inclined to sustain any portion of the demurrer, leave to amend should be granted.

14

Garland Connect did not identify any additional facts it would allege if leave to amend were granted.

The court sustained the demurrers without leave to amend as to Wells Fargo and the Eastdil defendants. As to the claim for intentional interference with contractual relations, the court concluded the operating agreement unambiguously provided the upstream parties "might choose not to renew the upstream lease, and [Garland Connect] had only a conditional right to the option. This conclusion was confirmed on appeal. Given that the right to renewal was 'not absolute,' the fact that [Garland Connect's] lease was not renewed is insufficient, on its own, to constitute disruption." As to the claim for intentional and negligent interference with prospective economic advantage, the court concluded Garland Connect "has not alleged any conduct by . . . Wells Fargo . . . which could support this cause of action." "[T]he allegation that the Wells Fargo [d]efendants made representations to Rising Realty is insufficient because [Garland Connect] does not allege that the Wells Fargo [d]efendants disrupted the probability of a future economic benefit from Rising Realty. Rather, [Garland Connect] alleges disruption to its relationship with customers, and [Garland Connect] does not allege that Wells Fargo made any representation about [Garland Connect's] rates to customers."

The court entered a judgment of dismissal on October 6, 2021. Garland Connect timely appealed.

15

# DISCUSSION

A. *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint. "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.] Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162; accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.)

We assume the truth of the properly pleaded factual allegations and matters of which judicial notice has been taken. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230; *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*); see Code Civ. Proc., § 430.30, subd. (a).) We liberally construe the pleading with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Schifando,* at p. 1081.) "However, the assumption of truth does not apply to contentions, deductions, or conclusions of law and fact. [Citations.] Furthermore, any allegations that are contrary to the law or to a fact of which judicial notice may be taken will be treated as a nullity." (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1102.) "'While the "allegations [of a complaint] must be accepted as true for purposes of demurrer," the "facts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be given precedence.'"'"

16

(*Moran v. Prime Healthcare Management, Inc.* (2016)
3 Cal.App.5th 1131, 1145-1146; accord, *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 726.)

We review the trial court's decision to deny leave to amend for an abuse of discretion.  A trial court abuses its discretion by sustaining a demurrer without leave to amend where "'there is a reasonable possibility that the defect can be cured by amendment.'"  (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; accord, *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)  "'The plaintiff has the burden of proving that [an] amendment would cure the legal defect, and may [even] meet this burden [for the first time] on appeal.'"  (*Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1132; accord, *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)

B.      *The Trial Court Did Not Err in Sustaining the Demurrer*
        1.      *To State a Claim for Interference with the Extension Options, Garland Connect Had To Allege an Independently Wrongful Act*

"California has traditionally recognized two economic relations torts:  interference with the performance of a contract [citation] and interference with a prospective economic relationship [citation].  Both of these torts protect the public interest in stable economic relationships."  (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142-1143 (*Ixchel*), internal quotation marks and brackets omitted.)  "The two torts are related but distinct.  Tortious interference with contractual relations requires (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of

17

that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  [Citations.]  It is generally not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself.  [Citation.]." (*Id.* at p. 1141, internal quotation marks omitted.)

"Tortious interference with prospective economic advantage, on the other hand, does not depend on the existence of a legally binding contract.  A plaintiff asserting this tort must show that the defendant knowingly interfered with an economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff." (*Ixchel, supra,* 9 Cal.5th at p. 1141.)  Further, the plaintiff "must plead as an element of the claim that the defendant's conduct was wrongful by some legal measure other than the fact of interference itself." (*Id.* at p. 1142, internal quotation marks omitted.)

We first consider whether Garland Connect was required to allege that Wells Fargo interfered with the operating agreement by means of an independently wrongful act in order to state a valid claim.  In the first cause of action for intentional interference with contractual relations, Garland Connect relies on two theories:  (1) The Wells Fargo defendants induced HHRP to breach the operating agreement by failing to honor the extension options; and (2) the defendants interfered with the operating agreement by causing the acquisition agreement to be structured such that the conditions precedent to the extension options could not be fulfilled.

18

In light of our decision in *Garland Connect, LLC v. HRRP Garland, LLP, supra,* B296192, Garland Connect does not argue on appeal that its claim for intentional interference with contractual relations is valid because Wells Fargo induced HRRP to breach the operating agreement. Instead, Garland Connect's appeal is based on the second theory. Garland Connect argues that a defendant who is not a party to an agreement can be held liable for inducing the termination of an agreement "even if it is the case that the other contracting party could itself terminate the contract without being in breach." Garland Connect argues that a plaintiff making such a claim does not have to plead and prove an independently wrongful act. We conclude that under the specific factual circumstances here, Garland Connect was required to plead an independently wrongful act based on the reasoning in *Ixchel, supra,* 9 Cal.5th 1130.

a. *The* Ixchel *Decision*

In *Ixchel*, the Supreme Court held that a claim for interference with an at-will contract is treated as a claim for interference with prospective economic advantage and requires the plaintiff to plead and prove, among other elements, the defendant engaged in an independently wrongful act that actually disrupted the plaintiff's relationship. (*Ixchel, supra*, 9 Cal.5th at p. 1148.)

There, plaintiff Ixchel entered into an agreement with Forward Pharma (Forward) to jointly develop a drug. Forward had the right to terminate the agreement "at any time" so long as it provided Ixchel 60 days' notice. While the parties were working together to develop the drug, Forward was negotiating with defendant Biogen, Inc., another biotechnology company, to

19

settle a patent dispute.  Forward and Biogen entered into an agreement in which Biogen agreed to pay Forward $1.2 billion to license certain Forward patents and other intellectual property, and Forward agreed to terminate its agreement with Ixchel.  (*Ixchel, supra,* 9 Cal.5th at pp. 1138-1139.)  Ixchel sued Biogen in federal court, alleging, among other things, that Biogen interfered with its contract with Forward.  The district court dismissed the case, concluding that Ixchel had failed to state a claim for interference with prospective economic advantage or interference with contractual relations because Ixchel did not plead that Biogen engaged in an independently wrongful act.  (*Id.* at p. 1139.)  Ixchel appealed, and the Ninth Circuit certified the following question to the Supreme Court (as rephrased by the Supreme Court):  "Is a plaintiff required to plead an independently wrongful act in order to state a claim for tortious interference with a contract that is terminable at will?"  (*Id.* at p. 1140.)

The Supreme Court answered the question in the affirmative for primarily two reasons.  First, "[l]ike parties to a prospective economic relationship, parties to at-will contracts have no legal assurance of future economic relations."  (*Ixchel, supra,* 9 Cal.5th at p. 1147.)  The court explained:  "An at-will contract may be terminated, by its terms, at the prerogative of a single party, whether it is because that party found a better offer from a competitor, because the party decided not to continue doing business, or for some other reason.  And the other party has no legal claim to the continuation of the relationship.  The contracting parties presumably bargained for these terms, aware of the risk that the relationship may be terminated at any time.  At-will contractual relations are thus not cemented in the way

20

that a contract not terminable at will is.  The interest in protecting the contract from interference more closely resembles the interest in protecting prospective economic relationships than the interest in protecting a contractual relationship that, by its terms, is expected to continue on pain of breach."  (*Ibid.*)

"Indeed, sometimes the only difference between an at-will contract and a prospective economic relationship is the formality of how a contractual relationship is structured.  For example, a buyer who regularly renews a one-time contract to purchase goods has a prospective economic relationship with the vendor with respect to future purchases of those goods. (See *Shida v. Japan Food Corp.* (1967) 251 Cal.App.2d 864, 866 [interference with yearly renewal of contract treated as interference with prospective economic advantage].)  But that same buyer would have an at-will contractual relationship if it entered into a single contract with the vendor to provide those goods at regular intervals terminable at the buyer's will.  In both, the vendor has no legal assurance of the buyer's continued purchases." (*Ixchel, supra,* 9 Cal.5th at p. 1147.)

Second, "allowing interference with at-will contract claims without requiring independent wrongfulness risks chilling legitimate business competition." (*Ixchel, supra,* 9 Cal.5th at p. 1148.)  "Without an independent wrongfulness requirement, a competitor's good faith offer that causes a business to withdraw from an at-will contract could trigger liability or at least subject the competitor to costly litigation.  In fact, even if a business in an at-will contract solicits offers on its own initiative, a third party that submits an offer could face liability if it knew that acceptance of the offer would cause the soliciting business to withdraw from its existing contract.  Allowing disappointed

21

competitors to state claims for interference with at-will contracts without alleging independently wrongful conduct may expose routine and legitimate business competition to litigation." (*Ibid.*)

      b.     *The Claim Here Is Substantially Similar to a Claim For Interference With an At-will Contract*

Garland Connect contends Wells Fargo interfered with the extension options by structuring the sale of the building in a way that caused the buyer of the building to acquire the leasehold interests of RML and Charter Parent, thereby ensuring that the conditions precedent to the operating agreement would fail. As previously noted, the operating agreement provided that the extension options were subject to and conditioned upon RML's and Charter Parent's exercise of their options to extend the upstream leases, that is, RML's master lease with Turnbull for the land and building, and Charter Parent's sublease with RML. The operating agreement stated that those entities had the sole and absolute discretion to decide whether to exercise their options to extend those leases. The operating agreement also provided Charter Sub had no obligation to secure any right to occupy the building after February 28, 2019. Thus, under the express terms of the agreement, RML and Charter Parent had no obligation to extend the upstream leases, and Garland Connect's extension options would terminate if RML and Charter Parent did not extend them. Wells Fargo allegedly interfered with the extension options by inducing or causing RML and Charter

22

Parent to sell or assign their leasehold interest to HRRP instead of extending them.[4]

At the time of the alleged interference (i.e., before HRRP acquired RML's and Charter Parent's leasehold interests), the operating agreement was not an at-will contract because Garland Connect's contracting partner, Charter Sub, did not have the ability to control whether the conditions would be satisfied.[5]

---

[4] The first amended complaint alleges Wells Fargo "specifically structured the agreements for acquisition of the Garland Center and the purported extinguishment of the Ground Lease Arrangements in such a manner as to prevent the fulfillment of conditions precedent for . . . Garland Connect's exercise of its extension options." The "[g]round [l]ease [a]rrangements" were extinguished because HRRP acquired the upstream lease interests of RML, Charter Parent, and Charter Sub. Upon the acquisition, HRRP sent a letter explaining Garland Connect's extension options had been terminated because HRRP had acquired all fee and leasehold interests in the property, including interests in the RML lease and master lease. These allegations make clear that Wells Fargo's alleged interference consisted of causing or inducing Charter Parent and RML to assign or sell their leasehold interests to HRRP instead of exercising their options to renew the leasehold interests.

[5] After the transaction with HRRP closed, the extension options terminated, and HRRP, as Charter Sub's successor, had no obligation to renew the operating agreement after February 28, 2019. (*Garland Connect LLC v. HRRP Garland, LLP, supra,* B296192.) While HRRP could choose to extend the operating agreement after that date, it had no obligation to do so. Thus, after the close of the transaction, the agreement was, at best for Garland Connect, an at-will contract for the period after February 28, 2019.

However, the claim that Wells Fargo interfered with the operating agreement by causing the failure of the conditions is *similar* to a claim that a defendant interfered with an at-will contract. Garland Connect's rights under the extension options were expressly subject to conditions that were in the control of and at the will of third parties RML and Charter Parent. Wells Fargo allegedly interfered with the extension options by inducing or causing those third parties to sell or assign their leasehold interests to HRRP instead of extending them, a decision that the agreement acknowledged RML and Charter Parent had the right to make.

Accordingly, as to Garland Connect's extension options, the operating agreement was analogous to an at-will agreement, but instead of being subject to termination rights of Garland Connect's contracting party Charter Sub, the options were subject to conditions controlled by third parties RML and Charter Parent. In effect, the Garland Connect's extension options were subject to termination rights held by RML and Charter Parent; RML and Charter Parent had the right to decline to extend the master lease and RML lease, resulting in a termination of the extension options. Wells Fargo allegedly interfered with the extension options by causing or inducing those third parties to decline to extend their leasehold interests, resulting in the termination of the options.

In the typical claim for interference with an at-will contract, the plaintiff alleges a third-party stranger to the contract induced the plaintiff's *contracting partner* to exercise his or her right to terminate the contract. For example, in the employment context, a plaintiff employer may allege the defendant (a stranger to the contract) induced the at-will

24

employee to terminate his or her employment to take another job. Similarly, in *Ixchel, supra,* 9 Cal.5th 1130, plaintiff Ixchel alleged defendant Biogen induced Ixchel's contracting partner Forward to terminate the agreement with Ixchel and enter into a contract with Biogen. In each case, the claim is that the allegedly interfering stranger to the contract induced the plaintiff's contracting partner to take actions the contracting partner had the right to take under the contract.

Here, Garland Connect alleged Wells Fargo, as a stranger to the contract, induced or caused *third parties* RML and Charter Parent to exercise their rights to take actions that resulted in a termination of the agreement. In both this case and the typical case for interference with an at-will contract, the purportedly interfering defendant is alleged to have induced a person who has a right under the contract to take an action to actually take the action. Further, in both this case and the typical case for interference with an at-will contract, the alleged interference resulted in a termination of the contract but not its breach.

The reasons that the *Ixchel* court relied on in imposing a wrongful act requirement apply here. As with an at-will contract, Garland Connect had "no legal assurance of future economic relations" after the initial termination date, and thus "[t]he interest in protecting the contract from interference more closely resembles the interest in protecting prospective economic relationships than the interest in protecting a contractual relationship that, by its terms, is expected to continue on pain of breach." (*Ixchel, supra,* 9 Cal.5th at p. 1147.) In a claim involving a typical at-will agreement, the contracting party has no legal assurance his or her *contracting partner* will not terminate an agreement. Here, Garland Connect had no legal

25

assurance that *non-contracting third parties* Charter Parent or RML would extend their leasehold interests, thus allowing Garland Connect to exercise its extension options.

Further, if Garland Connect were allowed to proceed with an interference claim without alleging an independently wrongful act, the risk of chilling legitimate business activity would be equal to that in *Ixchel, supra,* 9 Cal.5th 1130. In *Ixchel*, the court reasoned that allowing a claim for interference with an at-will contract without requiring an independently wrongful act would chill competitors from making good faith offers to the party with the right to terminate and would impair the ability of that party to solicit legitimate alternative offers. (*Id*. at p. 1148.) The court recognized a public policy against "chilling legitimate business competition" and against "expos[ing] routine and legitimate business competition to litigation." (*Ibid*.)

Thus, in *Ixchel, supra,* 9 Cal.5th 1130, the court was concerned about imposing tort liability in a manner that would unduly chill business opportunities available to a *party* to an at-will agreement and those seeking to transact business with that party. Here, imposing tort liability without proof of an independently wrongful act would chill business opportunities available to *strangers* to the contract, specifically RML and Charter Parent. RML and Charter Parent had the right either to extend the master lease and RML lease or to not to extend them. Whether or not they chose to extend the leases could depend on other business opportunities available to them; they could choose not to extend their leases if a more attractive alternative opportunity arose. But if a third party who induced them to enter into the alternative transaction could be held liable for interfering in Garland Connect's operating agreement (as well as

26

other contracts between downstream sublessees and their licensees), the third party would be chilled from entering into the alternate transaction, which in turn would restrict the opportunities available to RML and Charter Parent. The public policy against chilling business opportunities available to *strangers* to the contract is at least as great as the public policy against chilling business opportunities available to a *party* to the contract. RML and Charter Parent did not enter into an agreement with Garland Connect; their interests in being able to pursue alternative business transactions is at least as strong as the interest of a party to an at-will contract to do so. For those reasons, we conclude Garland Connect had to plead and prove an independently wrongful act to state a claim for interference.

There are other reasons for requiring Garland Connect to allege an independently wrongful act to state a claim for interference. Garland Connect's contracting partner Charter Sub was a sublessee who granted Garland Connect a license to occupy the building to run the MMR. Charter Sub's and Garland Connect's rights to occupy the building were necessarily limited by the scope of the Charter Sub's sublease; a sublessee cannot grant a licensee or subsublessee rights to occupy a building that are greater than the sublessee's own rights. (*Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 883 ["[u]nder California law, a subtenant's rights are dependent upon and subject to the sublessor's rights. [Citations.] Rights under the sublease stand or fall with those of the sublessor," internal quotation marks, ellipses, and brackets omitted].) Further, Charter Parent could not grant Charter Sub rights to occupy the building that were greater than the rights under its own sublease agreement with RML, and RML could not grant Charter Parent

27

rights to occupy the building that were greater than the rights it held under the master lease agreement with Turnbull. Garland Connect's rights were necessarily subject to the superior rights of upstream owners, lessors, and sublessors (including Turnbull, which owned the building and held an estate for years in the land; RML, which held the master lease to the land and building; and Charter Parent, which was a sublessee of RML).

Garland Connect's extension options were necessarily dependent on RML and Charter Parent's exercise of their options to extend the leases and subleases. Allowing the claim for interference to proceed without requiring Garland Connect to plead and prove an independently wrongful act would, in effect, allow Garland Connect, as a licensee to a sublessee, to restrict the rights of the upstream lessors and lessees to pursue alternatives to extending their leases and subleases. That is because the potential contracting partners of upstream lessors and lessees would be chilled by the threat of tort liability from entering into the alternative transaction.

In concluding Garland Connect had to plead an independently wrongful act, we do not suggest a plaintiff must plead and prove an independently wrongful act to state a valid claim for interference any time a contract is subject to a condition precedent that has not yet occurred. Our holding is limited to circumstances in which (1) the contract was subject to a condition precedent that depended on a third party taking a certain action; (2) the contract expressly stated the third party had no obligation to take the action, and whether or not to do so was within the discretion of the third party; (3) the defendant allegedly interfered with the contract by inducing or causing the third party not to take the action, thereby causing a failure of the

condition; and (4) the alleged interference did not cause or induce a breach of the agreement.  When those conditions are met, the claim for interference is similar enough to a claim for interference with an at-will contract that the independently-wrongful-act requirement applies.

### c. *The Cases Garland Connect Cites Do Not Compel a Different Result*

Garland Connect cites several cases for the proposition that a claim for interference with contractual relations can be based on an at-will contract.  To the extent Garland Connect suggests that a plaintiff asserting such a claim does not have to allege an independently wrongful act, Garland Connect's position is foreclosed by *Ixchel, supra,* 9 Cal.5th at p. 1148.  The cases Garland Connect cites were all decided prior to *Ixchel*.

Further, contrary to Garland Connect's argument, the Supreme Court in *Pacific Gas & Electric Co., supra,* 50 Cal.3d 1118 did not hold that a plaintiff alleging a claim for interference with an at-will contract may state a claim for interference with contractual relations, as opposed to interference with prospective economic advantage.  As the Supreme Court explained in *Ixchel*, "*Pacific Gas* expressly reserved the question of whether interference with an at-will contract should be treated as a claim of interference with contractual relations or as a claim of interference with prospective economic advantage.  Because the alleged misconduct in that case did not constitute interference with any economic relationship, contractual or otherwise, it was unnecessary to resolve the question." (*Ixchel, supra*, 9 Cal.5th at p. 1144.)  As discussed, *Ixchel* resolved the question and held that a claim for interference with an at-will contract is treated as a

29

claim for interference with prospective economic advantage, requiring proof that the defendant committed an independently wrongful act. (*Id.* at p. 1148.)

Garland Connect relies heavily on *SCEcorp v. Superior Court* (1992) 3 Cal.App.4th 673 (*SCEcorp*), but the case does not establish that Garland Connect can state an interference claim without alleging an independently wrongful act. There, San Diego Gas & Electric Company (SDG&E) and Tucson Electric Power Company (Tucson) entered into a written merger agreement that was conditioned on regulatory approval by various governmental entities. The merger agreement was approved by the parties' respective boards of directors. Before the parties were able to obtain the required regulatory approval, defendant SCEcorp allegedly interfered with the contract by making an unsolicited offer for SDG&E, improperly acquiring SDG&E shares, and improperly inducing members of SDG&E's board of directors and management to abandon the proposed merger with Tucson. (*Id.* at pp. 675-676.) Tucson sued SCEcorp for intentional and negligent inference with contractual relations and with prospective economic advantage. SCEcorp demurred. The trial court overruled the demurrer. Tucson filed a petition for writs of mandate and prohibition, and, following directions from the Supreme Court, the Court of Appeal ultimately issued an alternative writ.[6] (*Id.* at pp. 676-677.)

---

[6] The Court of Appeal initially summarily denied the writ petition. The Supreme Court granted review and transferred the matter back to the Court of Appeal with directions to vacate the order denying mandate and to issue an alternative writ to be heard by the Court of Appeal. The Court of Appeal then issued an alternative writ. (*SCEcorp, supra,* 3 Cal.App.4th at p. 676.)

30

The sole issue in the writ proceeding was "whether the existence of regulatory approval as a condition precedent to completion of the merger pursuant to the [m]erger [c]ontract must, as a matter of law, deprive Tucson of its three causes of action for tortious inference." (*SCEcorp, supra,* 3 Cal.App.4th at p. 678.) The court held that it did not. "Tucson had sufficient 'expectancies' arising out of its [m]erger [c]ontract which would support its tortious interference claims." (*Id.* at p. 679.)

*SCEcorp* does not assist Garland Connect for several reasons. First, unlike here, the claim there was not that SCEcorp interfered with the contract by causing the failure of the condition precedent; the alleged interference was unrelated to the condition that the merger had to be approved by regulatory authorities. The court did not directly address the standard that would apply to a claim that a defendant caused the condition precedent to fail, but the court suggested in dicta that SCEcorp could take *lawful* actions to prevent the occurrence of the condition without incurring liability for interference. For example, the court stated: "SCE may very well be entitled to intervene directly in the regulatory approval process so long as its actions are within the normal parameters of such regulatory procedures. Such action could include appearing before the regulatory agencies during hearings and presenting evidence as to why SCE believes the merger would not be in the public interest or as to other factors which are of legitimate concern to the regulatory agencies." (*SCEcorp, supra*, 3 Cal.App.4th at p. 681.) The decision thus does not support a blanket rule that a defendant may be held liable for interference with contractual relations when the defendant prevents the occurrence of a condition precedent through lawful means.

31

Second, unlike here, the alleged interference in *SCEcorp* likely caused a breach of the merger agreement. Although the issue is not explicitly addressed, the opinion does not imply that SDG&E had the contractual right to abandon the merger agreement before the regulatory process was complete or that SDG&E's abandonment did not constitute a breach. The case thus provides no authority for the standards that apply to a claim for interference that allegedly resulted in the termination of a contract but not its breach.

Third, the court in *SCEcorp* did not address, and would have had no reason to address, whether the plaintiff had to plead and prove an independently wrongful act to state a valid claim. *SCEcorp* was decided before *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 (*Della Penna*). Before the *Della Penna* decision, our high court "treated interference with contractual relations and interference with prospective economic advantage as two species of the same tort. [Citation.] Each tort contained the same elements with the exception that interference with contractual relations required the existence of a binding contract. [Citation.] The primary difference between the two torts was that the range of acceptable justifications—that is, affirmative defenses—was broader when a defendant interfered with an unconsummated prospective economic relationship. [Citations] . . . [¶] That changed in *Della Penna*, when [the court] 'dr[e]w and enforce[d] a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with.'" (*Ixchel, supra,* 9 Cal.5th at pp. 1141-1142.) *Della Pena* established, for the first time, that a plaintiff seeking to recover damages for interference with prospective

32

economic advantage must plead an independently wrongful act as an element of the claim.  (*Ibid.*)  *SCEcorp* thus provides no guidance as to whether, under current law, a plaintiff asserting a claim for interference of a contract subject to conditions precedent that had not yet occurred would have to plead and prove an independently wrongful act.  We need not reach that question here, and instead decide the issue on the narrow grounds discussed above.

In sum, the cases Garland Connect cites do not undermine our conclusion that Garland Connect had to allege Wells Fargo interfered with the agreement by committing an independently wrongful act.

  2. *Garland Connect Did Not Adequately Allege Wells Fargo Committed an Independently Wrongful Act that Interfered with Garland Connect's Extension Options*

"'[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'"  (*Ixchel, supra,* 9 Cal.5th at p. 1142; accord, *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 (*Korea Supply Co.*).)  "An act is not independently wrongful merely because defendant acted with an improper motive."  (*Korea Supply Co.*, at p. 1158.)  Such conduct must also be "independently actionable" (*id.* at p. 1159), which means the legal standards must "provide for, or give rise to, a sanction or means of enforcement for a violation of the particular rule or standard that allegedly makes the defendant's conduct wrongful."  (*Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.* (2006) 138 Cal.App.4th 1215, 1223 (*Stevenson Real Estate Services, Inc.*).)  Whether an alleged act is independently wrongful is a legal question for the

33

court. (*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.* (2021) 71 Cal.App.5th 528, 537-538.)

"The independently wrongful act must be the act of interference itself, but such act must *itself* be independently wrongful. That is, '[a] plaintiff need not allege the interference and a second act independent of the interference. Instead, a plaintiff must plead and prove that the conduct alleged to constitute the interference was independently wrongful, i.e., unlawful for reasons other than that it interfered with a prospective economic advantage.'" (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1404; see also *Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd., supra,* 71 Cal.App.5th at p. 538 [to prevail on a claim for intentional interference with prospective economic advantage, a plaintiff must prove, among other elements, "(a) the defendant *engaged in conduct that interfered* with [plaintiff's economic] relationship [with a third party] and (b) the defendant's conduct was 'independently wrongful,'" italics added].)

Here, Garland Connect alleged Wells Fargo "structured the agreements for acquisition of the Garland Center and the purported extinguishment of the [g]round [l]ease [a]rrangements in such a manner as to prevent the fulfillment of conditions precedent for, and thereby attempt to preclude, Garland Connect's exercise of its extension options." In addition, Wells Fargo allegedly "represented to Rising Realty and other prospective buyers that it would be able to terminate the MMR Operating Agreement by acquiring the fee interest of the Garland Center as well as the Master Lease and RML Lease." Wells Fargo also allegedly "conducted extensive legal research and formulated a specific strategy concerning how the [operating

34

agreement] could purportedly be terminated" and agreed to fund litigation over the issue. "Rising Realty was selected as the buyer of choice by [Wells Fargo] because it agreed to [Wells Fargo's] scheme to oust Garland Connect from its [l]ease at the Garland Center." Garland Connect alleged Wells Fargo took these actions "as part of a personal vendetta against one of Garland Connect's members."

None of these actions constitutes an independently wrongful act. Garland Connect does not identify any actionable legal standard that these acts supposedly violated. Instead, the allegations focused on Wells Fargo's allegedly improper motive to interfere with the agreement, which, again, is not sufficient. (*Korea Supply Co., supra,* 29 Cal.4th at p. 1159.)

Garland Connect also alleged Wells Fargo "funded . . . and approved" an arbitration proceeding initiated by HRRP in which HRRP attempted to terminate the operating agreement based on Garland Connect's purported material breaches of the agreement. These allegations are not sufficient for at least two reasons. First, inducing another person to bring a lawsuit and funding the litigation cannot support an interference claim unless the elements of malicious prosecution are satisfied. (*Pacific Gas & Electric Co., supra,* 50 Cal.3d at pp. 1136-1137.) Garland Connect did not allege facts sufficient to state a claim for malicious prosecution against Wells Fargo for inducing and funding the litigation. Second, Garland Connect did not allege the funding and approval of the arbitration proceeding caused the interference on which the claim was based. Garland Connect alleged it was harmed because it was unable to exercise its extension options and the agreement therefore terminated. But the arbitration proceeding did not result in the termination of the

35

agreement; instead, the arbitrator concluded Garland Connect had not materially breached the operating agreement and HRRP did not have the right to terminate the agreement on that ground. (See *Stevenson Real Estate Services, Inc., supra,* 138 Cal.App.4th at p. 1224 ["a plaintiff must plead and prove that the conduct *alleged to constitute the interference* was independently wrongful," italics added].)

Garland Connect also alleged Wells Fargo Bank's former vice presidents Reeve-Bailey and Ingram intentionally misrepresented to Rising Realty that Garland Connect caused Net2EZ, a prior tenant in the colocation business, to file bankruptcy by charging Net2EZ above market rates. If adequately alleged, defamation may constitute an independently wrongful act on which an interference claim can be based. (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1006-1007, disapproved on other grounds by *Ixchel, supra,* 9 Cal.5th at p. 1145.) But here, again, Garland Connect did not allege that the defamatory statements interfered with the extension options or with the renewal of the agreement. Garland Connect did not allege any connection between the allegedly defamatory statements and the failure of the conditions precedent or the termination of the agreement.

Garland Connect also claimed Wells Fargo interfered with Garland Connect's prospective economic relationships with its MMR customers because Garland Connect was unable to extend its agreements with those customers beyond February 28, 2019. Garland Connect alleged this interference flowed from Wells Fargo's interference with the extension options. This claim was based on the same alleged conduct as previously discussed and failed for the same reasons.

36

Because Garland Connect did not adequately allege that Wells Fargo engaged in an independently wrongful act that interfered with the operating agreement or with its prospective economic relations with its customers, the trial court did not err in sustaining Wells Fargo's demurrer.

C.    *Garland Connect Has Not Demonstrated It Could Cure the Defects in the First Amended Complaint by Amendment*

In the trial court, Garland Connect did not identify any additional facts it would allege if leave to amend were granted. Accordingly, the court sustained the demurrer without leave to amend. On appeal, Garland Connect urges us to reverse the judgment to allow leave to amend based on new facts identified for the first time on appeal.

In reviewing a judgment entered after a demurrer was sustained without leave to amend, we must determine whether there is a reasonable possibility the plaintiff can cure the defect in the operative complaint by amendment. The plaintiff bears the burden of proving there is a reasonable possibility it may do so. The burden is "not pro forma." (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 432 (*Green Valley Landowners Assn.*).) "'To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading."'" (*Hacala v. Bird Rides, Inc.* (2023) 90 Cal.App.5th 292, 304.) "The plaintiff must clearly and specifically set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusionary." (*Green Valley Landowners Assn.*, at p. 432, internal quotation marks and ellipses omitted.)

37

"[A]n appellant may rely on statements made for the first time on appeal to show that there is a reasonable possibility that the complaint can be amended to state a cause of action." (*Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 414 (*Eghtesad*); accord, Code Civ. Proc., § 472c, subd. (a) ["[w]hen any court makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made"]; *Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority, supra,* 19 Cal.App.5th at p. 1132 [plaintiff may carry burden of proving an amendment would cure a legal defect for the first time on appeal]; *Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 881 [showing may be made to the reviewing court for the first time on appeal].)

Garland Connect asserts that if leave to amend is granted, it will allege that Reeve-Bailey, acting on behalf of Wells Fargo, falsely "represented to several of [Garland Connect's] [c]ustomers including AT&T, Wilshire Connection, Evocative and Cogent that [Garland Connect] was charging more than 'market rates'" for the MMR services. It will further allege that "as a result of these defamatory falsehoods [Garland Connect's] relationships with existing customers in the Garland Center were harmed *before* [Garland Connect] was evicted."

Garland Connect has not identified any harm that allegedly flowed from the alleged defamatory statements other than inducing the customers not to renew the long-term agreements beyond 2019. In the first amended complaint, Garland Connect alleged the Rising Realty defendants made those same

misrepresentations to the same customers, which caused the customers to decline to renew long term contracts beyond February 2019.  Such harm is not legally cognizable because Garland Connect did not have the right to operate the MMR beyond February 2019.  Garland Connect does not identify any other alleged interference or harm that flowed from the allegedly defamatory statements.  Garland Connect has thus not met its burden to set forth specific factual allegations that sufficiently state all required elements of the cause of action.  (*Hacala v. Bird Rides, Inc., supra,* 90 Cal.App.5th at p. 304 [describing what a plaintiff must show to justify leave to amend based on facts identified for the first time on appeal]; *Green Valley Landowners Assn.*, *supra,* 241 Cal.App.4th at p. 432.)

Garland Connect also states that if given the opportunity to amend, it will allege Wells Fargo interfered with the operating agreement by fraudulently concealing that it "was actively scheming to sell the building in a way that would make the exercise of [the extension options] impossible."  "Wells Fargo conspired with the other named defendants to keep this scheme a secret, knowing that the expenses [Garland Connect] was incurring would benefit them in the sale of the building by making it more valuable."  Garland Connect alleges this harmed it because it made improvements to the building it would not have made had it known that Wells Fargo planned to sell the building.  Garland Connect also seeks leave to amend to assert a separate claim for fraudulent concealment against Wells Fargo.

Garland Connect has not raised a reasonable possibility that it can state a valid claim for interference or fraud based on Wells Fargo's purported concealment.  "'The required elements for fraudulent concealment are (1) concealment or suppression of

39

a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact.'" (*Hambrick v. Healthcare Partners Medical Group, Inc.* (2015) 238 Cal.App.4th 124, 162.)

Courts have identified "'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.'" (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 (*LiMandri*).) In each case, however, the nondisclosure is actionable only if there is "some other relationship between the plaintiff and defendant in which a duty to disclose can arise." (*Id.* at pp. 336-337.)

"As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." (*LiMandri, supra,* 52 Cal.App.4th

40

at p. 337; accord, *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1187.)

Garland Connect argues a duty to disclose arose because Wells Fargo had exclusive knowledge of material facts that Garland Connect did not know—specifically that Wells Fargo had entered into negotiations for the sale of the Garland Center that would extinguish RML and Charter Parent's leasehold interests. Garland Connect alleges Wells Fargo began marketing the property for sale in September 2015. On June 3, 2016, on or about the date the transaction closed, Charter Parent notified Garland Connect that the property had been sold and that "Purchaser has acquired all fee and leasehold interests in the Property, including the interests in the RML Lease and Master Lease . . . and that upon the Closing, all such leasehold interests merged into the fee interest in the Property and all such agreements granting the leasehold interests, including the RML Lease and Master Lease terminated in their entirety. . . . All rights contingent upon the existence and renewal of the Master Lease and RML Lease, including any extension rights, are hereby extinguished in connection with and as a result of the termination of such agreements as a result of the acquisition of the Property." Thus, Garland Connect was informed of the transaction and its effect on the extension options shortly after it closed. Garland Connect's theory is that Wells Fargo had a duty to inform Garland Connect it had entered into negotiations for the sale *before* the transaction closed.

Garland Connect has not articulated any relationship with Wells Fargo that would give rise to a duty to disclose. Wells Fargo was not a party to the operating agreement; indeed, the interference claim is necessarily premised on the contention that

41

Wells Fargo was a stranger to the agreement.  (See *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 65 [contracting party cannot be liable for interference].)  Nor was Wells Fargo the holder of the upstream leasehold interests identified in the operating agreement; those parties were RML and Charter Parent.  Garland Connect is thus not entitled to leave to amend to state a claim based on an alleged fraudulent concealment.

## DISPOSITION

The judgment of dismissal is affirmed.  Wells Fargo's request for judicial notice is denied as not relevant.  Wells Fargo is to recover its costs on appeal.


                                        ESCALANTE, J.*

We concur:



SEGAL, Acting P. J.



FEUER, J.

---

*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42